**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff/Respondent, | § | |
| | § | CR. No. C-07-123 |
| v. | § | (C.A. No. C-10-00324) |
| | § | |
| JUAN ZUNIGA, | § | |
| | § | |
| Defendant/Movant. | § | |

**MEMORANDUM OPINION AND ORDER
DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE AND
ORDER DENYING CERTIFICATE OF APPEALABILITY**

Pending before the Court is Movant Juan Zuniga's (Zuniga) motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. D.E. 155.[1] The government filed its combined Answer and Motion to Deny Relief, along with a motion to file its response out of time. D.E. 167, 168. Zuniga has not filed a Reply.

The government's motion for leave to file its response out of time (D.E. 167) is GRANTED. Zuniga's motion to vacate (D.E. 155) is DENIED and he is DENIED a certificate of appealability.

---

[1]  Zuniga filed multiple motions to set aside sentence (D.E. 155), another motion pursuant to § 2255 with attachments (D.E. 157), a motion to vacate (D.E. 158), and a separate Affidavit in Support (D.E. 159) that was also attached to D.E. 155. The first of these filings was docketed on October 5, 2010, the last was docketed October 8, 2010. The Court considers them all as they are substantially duplicative of each other.

## I.  JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.  FACTS AND PROCEEDINGS

Zuniga was indicted on March 14, 2007, on one count of conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. D.E. 1. He was arrested in late April 2007. D.E. 6. He was arraigned and later detained pending trial. D.E. 9.

Trial began in July 2007 and lasted six days. D.E. 69, 75-79. The cases of four other defendants who were separately charged were determined to be related. See D.E. 3. During trial, several of his co-conspirators, Marciel Castillo, Angelo Pellot, Roberto Ysassi, and Joe Compean, testified against Zuniga.

In exchange for his cooperation and testimony against Zuniga, Marciel Castillo was not arrested or charged with his role in the conspiracy. D.E. 136 at 148-50, 167-68. Castillo, who was 27 years old, testified he had known Zuniga all his life. Id. at 98. Zuniga hired Castillo to drive him around for a period of six to 12 months beginning in 2001, after Zuniga broke his collar bone. D.E. 136 at 101-02. Even after Zuniga was able to drive, Castillo continued to work for him. Castillo drove Zuniga in a red Ford Focus. Id. at 106. In a six month period, Castillo drove Zuniga to visit his sister in Dallas approximately 20 times. Id. at 104.

Each trip begin when Zuniga telephoned Castillo to come pick him up. Castillo went to Zuniga's house and drove him to Matamoros, Mexico in a brown Chevrolet Malibu that Zuniga owned. Id. at 105. Sometimes they crossed into Matamoros on foot, sometimes they

took the Malibu across. Id. at 106. Castillo drove Zuniga to Mexico at least ten times during a six month period beginning in 2001. Id.

After the men arrived in Matamoros, they picked up the red Ford Focus. Id. at 107. Castillo believed the red Ford Focus belonged to Zuniga because he heard Zuniga tell the agents at the border checkpoint that it was his car. Id. at 149-50. Zuniga knew where the car would be parked and had the keys. Id. Zuniga and Castillo crossed back into the United States with the Ford Focus. Id at 108. They did not meet with anyone. Id. at 107.

During that time, Zuniga was not employed. Id. at 109. Zuniga paid Castillo approximately $100 per trip most times. Other times, Zuniga bought him clothing. Id. at 109. When they went to Dallas, they stayed with Zuniga's sister, her husband and her mother-in-law. The trips usually lasted three days. Id. at 110. Zuniga sometimes left the Dallas house at night by himself with the red Ford Focus. Id. at 111. Zuniga usually paid Castillo in Mexico, but sometimes in the U.S.

After awhile, Castillo began to believe they were doing something illegal involving drugs. Zuniga did not tell him, and when Castillo asked, Zuniga told him to mind his own business. Id. at 114-15.

On one occasion, Zuniga paid Castillo $3500 while they were in Mexico. Id. at 115-16. Sometimes, Castillo drive the red Ford Focus himself without Zuniga. Id. at 116. He also drove a Jeep Cherokee for Zuniga. Id. When Castillo was traveling for Zuniga, Castillo and Zuniga communicated using two-way radios, the Boost phones. Id. at 117. The cars were "loaded," but in the beginning, Castillo did not know what was in them. He later learned they

were transporting cocaine. Id. at 118. When Castillo drove on his own, Zuniga told him not to be nervous, just to cross the border and get through the checkpoint. Castillo was instructed to call Zuniga after he got through the checkpoint. Id. at 120-22.

During the time that Castillo worked for Zuniga, Zuniga had four or five different cell phone numbers over a period of eight months. Id. at 145. Although Castillo had a regular cell phone, while working for Zuniga he used a prepaid Boost phone which also functioned as a two-way radio. Id. at 145-46. Zuniga told Castillo that he could get a Boost phone in another name. Id.

On some trips, Zuniga and Castillo would travel the same route at the same time in separate vehicles. Id. at 123. They each drove a Ford Focus, one red, one white. Id. at 123-24. When Castillo drove alone, he was instructed to travel to the Dallas area, go to a hotel of his choice, rent a room, park the car, and wait. Id. at 124-25. Zuniga met Castillo at the hotel, picked up the car and left for several hours. Zuniga later returned the car to Castillo. Zuniga furnished the cash that Castillo used to pay for the hotel rooms, usually a Holiday Inn or Red Roof Inn. Id. at 126-27. The trips to Dallas usually lasted 2-3 days. Id. at 126.

Approximately eight months after Castillo started working for Zuniga, other people were brought in, Robert "Bobby" Ysassi and Angelo Pellot. Id. at 129-31. Bobby Ysassi sought out Zuniga to work because of the money. Id. at 132. Castillo told Ysassi that they were transporting an unknown substance that he believed to be drugs, but he did not know what kind. Id. at 133. Ysassi knew Zuniga from the neighborhood.

Castillo saw Angelo Pellot in Dallas at the hotel where Castillo stayed. Pellot was driving a Ford Focus. Id. at 136. The two men talked about their work with Zuniga. Pellot later introduced Castillo to Joe Compean who was also working for Zuniga. Id. at 137.

During the time he worked for Zuniga, Zuniga paid Castillo about $3500 per week. Id. at 138. He usually was paid in Mexico after Zuniga dropped off the car. They drove to Mexico, left the car in the food store parking lot, then  Zuniga left without the others, and later returned with money and paid them. Id. at 139.

Castillo stopped working for Zuniga after they argued over whether Castillo's ex-wife knew what he was doing for Zuniga. Id. at 140. Castillo admitted that Zuniga appeared threatening when he talked with Castillo about not talking to his ex-wife and Castillo believed Zuniga could follow though on the threat. Id. 140-41. During his testimony, Castillo stated that he felt nervous and threatened because he had never been in court before and Zuniga was staring him down. Id. at 141. Defense counsel objected and the Court overruled the objection.

Castillo also quit working for Zuniga because he did not want Ysassi to work for Zuniga. Castillo and Ysassi are related and Castillo did not want Ysassi to get into trouble. Id. at 142. Zuniga just stopped calling Castillo to work after their disagreements. Id. at 143.

Castillo did not know where the drugs were in the cars. Zuniga told him, "just drive, don't ask questions." Id. at 143. Castillo estimated he made approximately 20 round trips with Zuniga when Zuniga could not drive and another 20 round trips from Mexico to Dallas after Zuniga could drive. Id. at 153.

Rafael "Angelo" Pellot testified at trial. At the time of his testimony, he was incarcerated for possession of cocaine. Id. at 178. Pellot testified that he met Zuniga at a party in approximately 2005 and started working for him towards the end of 2005. Id. at 179-80. Ysassi approached Pellot about driving for Zuniga, which Zuniga confirmed the next day. Id. at 180-83. Ysassi and Pellot are close. Pellot lived with Ysassi's family for fourteen years. Id. at 184.

The day after Pellot's conversation with Zuniga,  Zuniga and Ysassi picked up Pellot and they crossed the border at Matamoros. Id. at 185-87. They stopped at the Chaparral restaurant and Zuniga gave Ysassi a set of keys, which Ysassi gave to Pellot. The keys were to a gold Jeep Cherokee. Id. Ysassi was given keys to a green Jeep Cherokee. Id. Pellot was instructed to drive the Jeep through the Port of Entry and take it home to wait for instructions. He had a two-way radio, Boost phone that he used to communicate with Zuniga. Id. at 190. Zuniga told Pellot to follow Ysassi to Dallas and to check in with Zuniga after the border checkpoint. Id. at 191.

Pellot knew that he was carrying something illegal, but he did not know what. Zuniga did not like Pellot asking questions. Id. at 193. After Pellot got past the checkpoint, Zuniga told him to drive to Dallas, get a hotel room and wait. He stayed at Holiday Inns or Red Roof Inns. Id. at 193-94. While working for Zuniga, Pellot made three trips a week to Dallas, every week during the 15 to 18 months Pellot worked for Zuniga. Id. at 194.

On the first trip, after Pellot got to Dallas, Zuniga came and got the Jeep, was gone several hours and returned the Jeep back to Pellot. Zuniga told Pellot he could go home to

6

Brownsville. After he got home, Pellot and Ysassi took the Jeeps back to Matamoros and parked them at the Chaparral restaurant. Zuniga arrived shortly thereafter, took the Jeep keys and left. Ysassi and Pellot waited for Zuniga to come back. Id. at 195-99. Zuniga paid Pellot $4000 the day they returned the cars to Matamoros. Id. at 199-200. Pellot's next trip took place two days later and was similar. Id. at 200. The first month Pellot worked for Zuniga, Zuniga paid him $12,000.

Pellot was returning from Dallas in the green Jeep Cherokee in 2005, when he was stopped in Kingsville and arrested for money laundering. Id. at 202. The officers found $75,000 in cash in the firewall of the Jeep. Id. at 206. Photos of the money recovered from the Jeep were used during Zuniga's trial. D.E. 73, Government Exhibits 26-31.

After he was arrested, Pellot was released. His wife told him that a lawyer was going to come get him. Pellot's wife told him that Zuniga gave her $5000 to hire the attorney. Id. at 210-11.

Later the night Pellot was released, Zuniga came to Pellot's house and asked what happened. When Pellot told Zuniga about his arrest, Zuniga accused him of lying and told Pellot to get proof that Pellot was arrested. Id. at 213-14. Later, when Pellot received a notice about the seizure of the money and the requirements to claim it, he showed it to Zuniga who told him not to worry about it. Zuniga told Pellot he needed documentation of the arrest to show to someone else. At the time he asked for documentation, Zuniga seemed angry and scared at the same time. Id. at 215. At trial, the government introduced hotel receipts for dates Pellot stayed in Duncanville and DeSoto, Texas, suburbs of Dallas.

When Pellot was arrested the second time in May 2006, Joe Compean was living with Pellot and his wife, Nancy Melendez. D.E. 136 at 220. That trip began when Zuniga called Pellot. They went to Matamoros and picked up a vehicle at the Chaparral. The car was a Chevy HHR. Id. at 223. Pellot drove the HHR three to four times before Pellot was arrested in May 2006. Compean had also driven it. Id. Shortly after the HHR was purchased, Zuniga picked up the car from Compean and took it to Matamoros to have the compartment installed. The HHR was in Mexico four or five days. Id. Pellot did not know where the compartment was until after he was arrested in May 2006 at the Sarita checkpoint and his lawyer told him. Id. at 235-38.

The HHR was purchased to replace another vehicle that had been stopped with drugs or money. Zuniga told Pellot and Compean to get another car, and Zuniga told them exactly what he wanted, the year, make and model of the replacement vehicle. After they found the vehicle, they took it home and called Zuniga to look at it. Zuniga came by and then he and Compean left to get money for the vehicle. Id. at 228. Compean returned without Zuniga and had $12,000 in cash. Compean left with the vehicle to return it to the dealer and several days later the Chevrolet HHR was purchased. Id. at 228-29.

The HHR was purchased in the name of  Katherine Leal. Leal was Compean's girlfriend at the time and later became his wife. Id. Leal was used because she had good credit. She was the owner of another vehicle purchased a few months before, a Honda CRV. Id. at 230. The CRV had also been stopped and drugs or cash was found in that car. Id. at 231. Zuniga took the CRV to Matamoros to have a hidden compartment installed in the rear

seating area floor. Compean and Pellot found the CRV after Zuniga asked them to find one and its purchase was similar to that of the HHR. Id. at 233-35. The CRV was traded in on the HHR along with the cash Zuniga furnished. Id. at 235.

During the time Pellot worked for Zuniga, Zuniga changed Boost phones twice a month. Id. at 238. Pellot bought his phone at Wal-Mart but changed it twice while working for Zuniga. Id. at 239. Zuniga paid him either in Matamoros or back in Brownsville. Sometimes in Matamoros, Zuniga divided up the cash giving some to each of the several men to carry across the border. After the border crossing, Zuniga collected the money and then paid each man in the U.S. Zuniga did that to avoid having $10,000 or more in any one person's possession when crossing the border. Id. at 242-44. Zuniga also provided expense money to each of the men when they left Matamoros, usually $500 each. D.E. 137 at 15.

Pellot pled guilty after he was arrested with drugs at the Sarita checkpoint in May 2006. D.E. 136 at 248. Pellot believed he was transporting illegal drugs, but he did not know it was cocaine until later. Id. at 249. Pellot had not yet been sentenced at the time of Zuniga's trial. Pellot admitted that he was testifying in the hopes of reducing his sentence. Id. at 251. After Pellot was first arrested with the money, Zuniga did not use him again for about two months. D.E. 137 at 19. After he was arrested in May 2006, Zuniga stopped using him to transport drugs. D.E. 137 at 18.

Pellot testified that as far as he knew, none of the vehicles used to transport drugs were registered to Zuniga. Id. at 240. Pellot testified that the vehicles they used to transport drugs for Zuniga were three Ford Focuses, two Chevrolet HHRs, and a Honda CRV. D.E.

137 at 14-15. According to Pellot, Zuniga was not employed during the time Pellot worked for him. D.E. 137 at 18.

After Pellot's arrest with the money in 2005, he told the agents that he was afraid for his life and would not tell them anything else. He was afraid for himself and for his family. D.E. 137 at 20. Pellot heard that people get hurt if they talk. He felt threatened. Id. at 21. Pellot testified that he heard that Zuniga showed the boss and some other people where he lived. Id. at 21.

Several law enforcement witnesses were presented at trial. One testified that he worked for the Kingsville Specialized Crime and Narcotics Task Force. The agent stopped Pellot for speeding in September 2005 when Pellot was driving the green Jeep transporting money. D.E. 137 at 34-36. The money was found in a compartment installed in the Jeep's firewall. When the agent opened the Jeep's hood, the agent noticed a heavy smell of Bondo, saw mud caked on the firewall, and fresh tool marks on the bolt holding the windshield wipers. Id. at 37. He testified that he had seen a compartment like the one in the Jeep the day before, covered with the same color of mud. The compartment in the firewall was not a factory compartment. Id. at 42. The Jeep was registered to Robert E. Saucedo. Id. at 46. That particular model Jeep has a natural cavity in the firewall, behind some plastic that allows one to look further into the firewall to access holes and ports to the engine. Id. at 58.

A Border Patrol Agent testified to his stop of Pellot who was driving the Chevrolet HHR on May 27, 2006, at the Sarita Border Checkpoint. D.E. 138 at 25-26. During the immigration stop, a canine was walked around the car and the dog alerted to the front of the

HHR. Id. at 29. Pellot was directed to secondary and removed from the car. The agent opened the hood and smelled fresh paint. Id. at 33. On further inspection, he noticed that the bolts holding the bumper to the frame had been painted. Id. The agent found cocaine in an area behind the front bumper. Id. at 35-36. The drugs were found in a natural cavity in the vehicle.

The same agent was involved in the stop of Compean on August 4, 2006, at the Sarita checkpoint. D.E. 138 at 38. That time the dog alerted to the trunk area of the vehicle. Cocaine was found in the back of the rear seats where the convertible top folds down. Id. at 40, 43. The agents saw fresh tool marks on the bolts holding the backrest.

Another Border Patrol Agent testified to the stop and arrest in June 2006 of Jose Luis Jimenez, who was driving a white Ford Focus. D.E. 138 at 48-51. Agents observed a bulge in the head rest area of the rear seat that was highly unusual. Id. at 51-52. Jimenez claimed that Joe Compean owned the cocaine and Compean's organization was smuggling a couple of loads of cocaine a week using Ford Focuses, Jeep Cherokees, and an HHR. Id.

Katherine Leal, Joe Compean's wife, testified that she knew Juan Zuniga because he was a friend of her husband's. D.E. 137 at 61. Leal testified that she accompanied Nancy Melendez when she went to see a lawyer after Pellot was arrested in 2005. She saw Nancy pay the lawyer in cash, but did not recall whether it was $5000 or $10,000. Leal went because her husband Compean asked her to go. Nancy Melendez got the money to pay the lawyer from Compean. Id. at 66-68. Leal saw Zuniga hand the money to Compean and heard Zuniga tell Compean for Nancy Melendez to be there at 8 a.m. Id. at 69, 73-74.

11

Approximately a month after Pellot's arrest, Compean called Leal and asked her to drive to Harlingen to help buy a small SUV with her credit. Id. at 76-77. When she got there, the paperwork was completed for a Honda CRV. Compean did not tell her why he needed the car and she did not ask. Id. at 78-79. Compean paid $7000 down for the vehicle in cash. Leal did not know where the cash came from. Id. at 79.

In February 2006, Compean again asked her to help him buy another vehicle by trading in the CRV for a new one, an HHR. Id. at 82. He only told her that he wanted a new truck. Id. at 82-83. Pellot gave her $12,000 in cash to pay off the old car and then trade it in on the new one. Leal ended up with a car loan of $12,000 after the cash and trade-in on the HHR. Id. at 85. Leal also helped Compean rent a Chevrolet Impala from Hertz in July 2005. Leal received notice that the HHR was impounded and she eventually responded to the notice.

Compean was detained in August 2006. After he was detained, Compean asked Leal to contact Zuniga to ask Zuniga to help pay for a lawyer for Compean. Id. at 90. The night Compean was arrested, Zuniga called Leal and asked her to drive to the Sarita  checkpoint to see if Compean's car was there because Compean was not answering his phone. Id. at 88-91.When Leal went through the checkpoint, she saw a Sebring convertible that Joe had been driving pulled to the side. Compean bought the convertible without her help. Id. at 92. Zuniga called her throughout the weekend checking on Compean. Id.

In September, Leal met with Zuniga at the local Wal-Mart. Id. at 95. Zuniga told her that he would help with bond money, with the payments on the HHR and would help her pay

Compean's attorney. Id. Zuniga asked her for a copy of the billing statement on the HHR so he could see the balance due. Id. at 96. Zuniga said he would pay it, but he never did. Id.

Zuniga gave Leal a Pontiac Aztec and instructed her to sell the car to get money for an attorney. Id. Leal drove the Aztec for a while, then sold it back to the dealer for $4000-$5000. Id. at 97. Leal continued to talk to Zuniga trying to get help to pay Compean's attorney and the truck payments. Leal worked two jobs and was going to school at that time. Id. at 98. About six weeks after Compean's arrest, Zuniga gave her $5000 to hire Compean an attorney. Id. at 99-100.

Jose Compean testified that he worked for Zuniga beginning in February 2005 until he was arrested in August 2006. Id. at 122. He understood that he would be picking cars up in Matamoros, driving them to a designated spot and dropping them off. Id. at 124-25. He thought there were probably drugs in the cars. Id. at 125. He testified similarly to Pellot and Leal. He made two to three trips a week between Brownsville or Mexico and Dallas. D.E. 137 at 139-40. He also made approximately ten trips to Houston. Id. at 140. At the end of each round-trip, Zuniga paid him between $2500 and $3000. Id. at 154. Compean testified that he knew he was transporting drugs, but did not know what kind of drugs until later when he came to believe it was cocaine. Id. at 155-56. Zuniga told him the compartments were installed in Matamoros. Id. at 184.

Compean testified that he bought a Chrysler Sebring under his brother's name. Id. at 187. He put $22,000-$24,000 in cash down on the vehicle and financed the balance. He made the down payment in two deposits. Zuniga sent him to Matamoros to get the money for both

down payments. Before buying the Sebring, Zuniga told him to rent one for Zuniga to inspect. Id. at 188. Zuniga took the Sebring to Matamoros to have the compartment installed. Id. at 219.

The day Compean was arrested, he was on his way to Dallas, but was stopped at the Sarita checkpoint. Id. at 190. Before his arrest, he did not know where the compartment was in the car. Id. He was arrested the first time he used the Sebring to haul drugs, although he took it through the checkpoint without drugs one time on Zuniga's instructions, after he picked it up in Matamoros. Id. at 192-93. Like the others, Compean used a Boost mobile phone to stay in touch with Zuniga. Id. at 193. Zuniga was listed as BB in his contact list. He changed his contact list often, every time he changed his number. Id. at 194

A Southwest Airlines employee testified that he compiled records requested by the government which reflected that Juan Zuniga made reservations to travel between Harlingen and Dallas, Texas. Those records were cross-referenced with a particular telephone number associated with Zuniga. D.E. 138 at 5-10. There were 69 one-way reservations between April 2004 and February 22, 2007. All of the ticketed flights were paid for in cash. Id. at 10-11. Some of the reserved flights were not ticketed.

Roberto Ysassi testified. D.E. 138 at 68. At the time of trial, he was incarcerated. Id. He was sentenced in March 2007. Zuniga provided a lawyer for him at one time. Id. at 107. Ysassi was cooperating with the government in the hopes of getting time off his sentence. Id. at 146.

14

Ysassi testified he had known Juan Zuniga since 2001 and was introduced to him by Marciel Castillo. Id. at 70. Towards the end of 2002, Castillo approached Ysassi and asked him to drive a car north for Zuniga. Id. at 70-71. At first Ysassi did not know why Zuniga went to Dallas all the time; he later learned that it was to transport cocaine. Id. at 74-75. His testimony regarding the trips was similar to that of Compean, Castillo and Pellot.

Ysassi testified that Zuniga told him to get a Boost phone to keep in touch with Zuniga. When he was driving for Zuniga, Ysassi telephoned Zuniga after he passed the international border and then again after the checkpoint. Id. at 82. Ysassi worked for Zuniga from late 2002 until his arrest in September 2006. Id. at 90. During the time Ysassi knew Zuniga, Zuniga did not have a job. Id. at 100.

Ysassi was arrested driving a Pontiac Aztec in September 2006. At the time he was stopped, Ysassi did not know where the drugs were in the car. Id. at 103. Initially, Ysassi did not know there were drugs in the cars. He asked Zuniga once, but Zuniga refused to tell him. Id. at 104-05.

A Border Patrol Agent testified that Anna Balderas, Zuniga's girlfriend or wife, came through the border at Matamoros to travel to Brownsville on June 25, 2007, in a gold Malibu registered to Zuniga's mother. D.E. 138 at 157. $9500 was found on Balderas, hidden in a girdle. Id. at 164, 169. Balderas declared the $500 in her purse, but did not declare the money found on her person. Id. at 165.

The detective in charge of the DEA task force out of Kingsville testified. D.E. 138 at 176. She became involved in the investigation on May 27, 2006, after the arrest of Pellot at

the Sarita border checkpoint. Id. Initially, Pellot did not provide any names of others involved in his transportation of cocaine because he claimed he feared for his and his family's safety. In a later interview, Pellot identified Juan Zuniga as the owner of the cocaine. Id. at 179. The DEA agents thought there was a connection between Jimenez, who was arrested three weeks earlier and Pellot. Id. They continued their investigation which led them to Compean and to Katherine Leal. Id. at 181. When the DEA agents interviewed Compean, he identified Pellot and Zuniga. Id. at 183.

The DEA analyzed the phones seized from Compean, Jimenez and Pellot, which led to Marciel Castillo. Id. at 183-84. Each of the phones also implicated Zuniga. Id. at 184. Between Pellot and a number Pellot identified as Zuniga's, there were over 176 calls in a 3 month period. Id. at 185. Compean's phone reflected 28 calls from Zuniga on the day of Compean's arrest. Id. The investigation also led to Ysassi, who was the registered owner of the vehicle Pellot was driving when the currency was seized. Pellot, Compean and Ysassi all debriefed. Jimenez did not. Id. at 187.

The total quantity of drugs seized from Compean, Jimenez, Pellot, and Ysassi was 25.94 kilograms of cocaine. The purity varied, but was as high as 89%. Street level distribution cocaine is usually near 50% pure. Id. at 188-91. The DEA agent also testified that the street value of a kilogram of cocaine sold in Dallas during this period was $2 million. D.E. 139 at 8-9.

The DEA case agent requested information from the Texas Workforce Commission regarding Juan Zuniga. That database did not reflect any jobs held by Zuniga during the years

16

2005 to 2006 in Brownsville, Dallas or anywhere in Texas. D.E. 139 at 80-81. A Juan Zuniga was listed with the same social security number as defendant Zuniga. That Juan Zuniga worked for Pilgrim's Pride. When the agent made further inquiry, she was able to determine that the Juan Zuniga, Jr. working for the poultry company in northeast Texas, was not the same Juan Zuniga arrested in this case. In fact, the Juan Zuniga, Jr. who worked for the poultry company was at work on a day that the defendant Juan Zuniga was in custody. Id. at 82-83.

The defense put on several witnesses. Compean testified that he was cooperating with the government pursuant to a plea agreement and that he hoped the government would make a motion that he receive time off his sentence. Id. at 119. Compean had not been sentenced at the time of the trial. Id. at 120. Compean was questioned by defense counsel about when he first mentioned Zuniga's name to the government, which was after his guilty plea. When the government next questioned him about why he waited, Compean testified that he "fear[ed] for my safety and my families." Id. at 122. He was asked why and Compean responded, "Because of the stories I've heard." Id. at 123. Defense counsel objected on hearsay and on Rule 403 grounds. The Court overruled the objections. Id. at 124.

The defense recalled the DEA case agent and questioned her about fingerprint reports that were received during trial from the examination of the packaging of the several of the drug bundles. The reports showed no prints lifted. Id. at 126. Defense counsel also questioned the agent about the possibility that the other Juan Zuniga took all those flights between Dallas and Harlingen.

17

The defense also called Anna Balderas to testify, Zuniga's wife. After Balderas was warned of the consequences, was appointed counsel and warned again of the potential consequences to herself, she testified that she was eighteen years old and married to Juan Zuniga. Id. at 140. She is the mother of a 3 month old daughter whose father is Zuniga. Id. Balderas testified that Zuniga did construction work in Dallas. Id. at 144. She testified that she lived with Zuniga in Dallas for approximately three months when she was seven months pregnant. Id. According to Balderas, Zuniga was paid by company check for the work he did in Dallas. Id. at 145. Balderas testified that she and Zuniga had been struggling with money ever since they began dating. Id. She further testified that she had not met Zuniga's friends because Zuniga is really jealous. They did have some cookouts, but she was not there much. Id. at 151. She never saw Zuniga with large sums of money. Id.

Balderas claimed that she had money given to her by her foster parents and it was that money she attempted to bring back from Mexico. Id. at 154-55. Instead of having a quinceanera, her family had a cookout in Mexico at her grandparent's house in Matamoros. She received cash for her 15th birthday, but was not allowed to have the money until after she turned 18. The money stayed with her aunt in Mexico. When she came back to the United States, she had the money hidden on her because she was afraid of being robbed in Mexico. Id. at 158-59. She was detained at the bridge and the money was confiscated. Balderas admitted that she did not declare the money when asked at the bridge. Id. at 165.

Balderas admitted that Zuniga told her he was working construction. She did not visit him at work. She claimed that she had check stubs from Zuniga's construction work at home but forgot to bring them to court, even though she knew they were very important. Id. at 170.

The defense rested and both sides closed. The defense renewed its motion to dismiss which was denied. Id. at 180. Neither side objected to the jury charge. D.E. 140 at 15, 23.

At the conclusion of the trial, Zuniga was found guilty on the sole count of the indictment. D.E. 92. The Court ordered a Presentence Investigation Report (PSR) on Zuniga and sentencing was scheduled. D.E. 93.

Zuniga's counsel filed objections to the PSR. D.E. 97. The Court overruled the objections to the PSR which contested several of the factual statements regarding the offense, including the calculation of drug quantity. D.E. 142 at 8-22.

The PSR calculated Zuniga's offense level as 40 based upon the quantity of cocaine and his position as leader/organizer. D.E. 99 at ¶¶ 22, 25, 27. Zuniga had several misdemeanor criminal convictions resulting in 6 criminal history points and application of criminal history Category III. Id. at ¶¶ 39-41. The Guideline imprisonment range was calculated to be 360 months to life. Id. at ¶ 53. At sentencing, the Court sustained counsel's objection that Zuniga's criminal history was overstated and sentenced him at Category II. D.E. 142 at 33-34. This change reduced the Guideline range to 324 to 405 months. Id. at 34. This Court sentenced Zuniga to 336 months imprisonment, lifetime supervised release, a $10,000 fine, and a $100 special assessment. D.E. 115.

Zuniga appealed to the Fifth Circuit. D.E. 115. On appeal, Zuniga challenged the sufficiency of the evidence and the admission of testimony that some of his coconspirators were afraid of him. D.E. 148. The Fifth Circuit affirmed. Id.

Zuniga filed a petition for writ of certiorari which was denied in October 2009. D.E. 154. Zuniga then timely filed his § 2255 motion in October 2009. D.E. 155.

### III.   MOVANT'S ALLEGATIONS

Zuniga raised multiple grounds of ineffective assistance of counsel in his original motion to vacate, D.E. 155. He included additional allegations in his Affidavit which he filed at the same time. Id. at 14-17. Zuniga claims that trial counsel was ineffective at sentencing because she failed to 1) consult with Zuniga about the PSR before the morning of sentencing, 2) provide a copy of the PSR to Zuniga, 3) discuss with Zuniga any objections to the PSR, 4) develop any mitigating evidence, and 5) properly object to the drug quantity at sentencing. D.E. 155, 157 (Zuniga's Memorandum in Support).

Zuniga next complains that counsel was ineffective on multiple grounds during trial because she failed to 1) properly object to the testimony of the cooperating witnesses that they feared Zuniga, 2) secure and present exculpatory evidence in the form of paychecks allegedly received by Zuniga, 3) subpoena Zuniga's telephone records to rebut testimony that the phone in his possession was consistent with the telephone number identified with him by federal agents, 4) investigate Castillo and bring his criminal record before the jury to impeach his credibility, 5) investigate the ownership of the red Ford Focus that Zuniga claims

belonged to Castillo not Zuniga, and  6)  subpoena Jose Jimenez to testify at trial. D.E. 157 at 41.

Finally, Zuniga complains that his appellate counsel was ineffective for failing to challenge the drug calculation on appeal. D.E. 157.

## IV.   ANALYSIS

### A.   28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: 1) constitutional issues, 2) challenges to the district court's jurisdiction to impose the sentence, 3) challenges to the length of a sentence in excess of the statutory maximum, and 4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam). "[A] collateral challenge may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982).

### B.   Standard for Ineffectiveness of Counsel

An ineffective assistance claim presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's

performance was both deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001). To show that his attorney's performance at sentencing in a noncapital case was prejudicial under Strickland, the movant must demonstrate that counsel's error led to some increase in the length of his imprisonment. Glover v. United States, 531 U.S. 198, 203, 121 S.Ct. 696 (2001); United States v. Herrera, 412 F.3d 577, 581 (2005).[2]

If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

"The entitlement to effective assistance does not end when the sentence is imposed, but extends to one's first appeal of right." United States v. Williamson, 183 F.3d 458, 462 (5th Cir. 1999) (citing Evitts v. Lucey, 469 U.S. 387, 394 (1985)); Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir.1998)). Counsel's appellate performance is also judged under the Strickland standard. 466 U.S. 668. "When a claim of ineffective assistance of counsel is

---

[2] The Fifth Circuit adopted the "any amount of jail time" test in United States v. Grammas, 376 F.3d 433, 439 (5th Cir. 2004). "This test originated from the Supreme Court's decision in Glover v. United States where the Court explained that any amount of additional jail time has significance under Strickland." Id. (internal citations omitted).

premised on counsel's failure to raise an issue on appeal, 'the prejudice prong first requires a showing that [the Fifth Circuit] would have afforded relief on appeal.'" United States v. Reinhart, 357 F.3d 521, 530 (5th Cir. 2004) (quoting United States v. Phillips, 210 F.3d 345, 350 (5th Cir. 2000)).

## C.   Claimed Ineffective Assistance During Trial

1.   *Ineffective assistance for failure to object to testimony by Pellot and Castillo that they feared Zuniga*

The testimony that several of the witnesses feared Zuniga came in through several witnesses. Counsel objected on several occasions, but did not object the first time.[3]

During Castillo's testimony, Castillo claimed that he was nervous in part because Zuniga was staring at him in the courtroom. He also testified that he had been concerned about a potential threat from Zuniga, but admitted there had been no specific threat. Counsel objected and the Court overruled the objection. The testimony was elicited on direct examination by the government,

21 Q Did Mr. Zuniga tell you whether or not anything would
22 happen if you told someone?
23 A (***) like a threat or sometimes. It's not like a threat

---

[3]   The issue was also raised by appellate counsel in the Fifth Circuit. The Fifth Circuit held,

Even assuming that it was an abuse of discretion for the district court to overrule Zuniga's objection to Compean's testimony [about his fear], such error was harmless. Castillo's and Pellot's similar testimony occurred prior to Compean's statement, so the admission of this statement would have resulted in no harm. Additionally, there was an overwhelming amount of evidence pointing to Zuniga as the leader of the conspiracy, which also supports a finding of harmless error.

D.E. 148 at 13.

24 -- yeah, like a threat, like, hey, she didn't know? You know
25 they're going to do something to you or something if they know
1 information.
2 Q Did you believe he could follow through with that threat?
3 A Yes, ma'am.
4 Q Why?
5 A I don't know, just a hunch, like just like I see movies
6 like they threaten people, like, just --
7 Q Do you have specific knowledge that Mr. Zuniga could
8 follow through with his threat?
9 A Right now, I don't know, ma'am.
10 Q Mr. Castillo, are you nervous today?
11 A Yes, ma'am.
12 Q Why are you nervous?
13 A I've never been in a court, and he's like staring me down
14 or something like that.
15 Q Who's staring you down?
16 A Zuniga.
17 [Defense Counsel]: Your Honor, I'm going to object.
18 THE COURT: It's overruled.
19 BY [government counsel]:
20 Q Who's staring you down?
21 A Zuniga.
22 Q Do you feel threatened having to testify today?
23 A Yes, ma'am.

D.E. 136 at 140-41.

On cross-examination, Zuniga's counsel developed the following line of testimony

with Pellot,

22 Q Do you remember telling the agents that the only person
23 you would identify was the person whose car it was? In other
24 words, you told the agents the car belonged to the guy that
25 recruited you, is that correct?
1 A Yes..
*       *       *       *
8 Q And isn't it also correct, Mr. Pellot, that it was only
9 after you pled guilty that you mentioned my client, Mr. Zuniga?
10 A Yes, ma'am.

D.E. 137. at 20. On redirect, the AUSA followed up,

> 11 Q Did you give a statement after you were arrested in the
> 12 Jeep? Did you talk to the agents?
> 13 A After that?
> 14 Q Yes, after you were arrested in the Jeep, did you talk to
> 15 the agents?
> 16 A That day or after?
> 17 Q That day or after.
> 18 A Yes, I did. Yes.
> 19 Q And what did you tell them?
> 20 A Well, I told them that I was afraid, you know, and I
> 21 couldn't say anything else because I was afraid for my life.
> 22 Q Why? Why did you tell them that?
> 23 A Because of what is lost, because I know if I say something
> 24 in that moment, I mean, I could get hurt, and not only me, my
> 25 family.
> 1 Q You knew that you could get hurt or your family?
> 2 A Yes.
> 3 Q How did you know that? Why did you think that?
> 4 A Because I heard that that is, you know, what I heard is
> 5 that people get hurt if, you know, if you open your mouth. And
> 6 not only you, they go after your family.
> 7 Q Were you ever threatened?
> 8 A I felt threatened.
> 9 Q Why?
> 10 A Because sometimes I heard that he, I mean, Mr. Zuniga went
> 11 with some people in my house and they showed them where I was
> 12 living.
> 13 Q That they were going to show up at your house or that they
> 14 did?
> 15 A He did. He showed the boss or whoever.
> 16 Q Who did?
> 17 A Mr. Zuniga.

Id. at 20-21. Counsel did not object to that testimony. Zuniga contends that counsel should have objected to the testimony of each witness on the grounds that it was unfairly prejudicial and the prejudice was not substantially outweighed by its probative value. Fed. R. Evid. 403.[4]

Pellot's testimony was elicited in response to cross-examination by defense counsel which suggested that Pellot was less credible because he waited to tell the agents about Zuniga until after his guilty plea. His explanation on redirect examination was a direct response to the attack on his credibility. Under the circumstances, counsel could not reasonably have expected such an objection to be sustained. See United States v. El-Mezain, 664 F.3d 467, 509 (5th Cir. 2011 (testimony of witness that he feared returning to Gaza which he claimed was controlled by Hamas not unfairly prejudicial when used to explain testimony elicited by defense about why the United States was assisting the witness to remain in the United States); United States v. Walker, 613 F.2d 1349, 1353 n.5 (5th Cir. 1980) ("Cross-examination with respect to part of a transaction enables the opposing party to elicit evidence on re-direct examination of the whole transaction at least to the extent that it relates to the same subject"); see also United States v. Touloumis, 771 F.2d 235, 241 (7th Cir.1985) ("[A] party cannot be permitted on the one hand to introduce evidence that appears favorable

---

[4]      The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

to his argument and then complain, after the circumstances are fully developed, because the evidence becomes detrimental to his cause.").

In Walker, the defense questioned a witness about her activities as a prostitute, suggesting it was the witness who purchased drugs rather than the defendant. When the government asked the witness if her prostitution benefitted the defendant, the defense objected. The Circuit court held the admission was proper because the defense opened the door to the rest of the transaction. Walker, 613 F.3d at 1353. Similarly, the defense opened the door to the witness' reason for delay in implicating Zuniga.

Castillo's initial testimony was vague. He did not claim that Zuniga threatened him in the past, but claimed he was fearful based on what he heard. His later testimony that he was nervous because Zuniga was staring him down in the courtroom was a situation that was obvious to the jury if it occurred. Either they observed it or they did not. Counsel objected on nonspecific grounds and was overruled.

Objections are often strategic and counsel may be loath to call attention to particular testimony if counsel believes that the objection, even if sustained, will cause more harm in front of the jury than good on appeal. An attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy. See Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993) (noting that a failure to object may be "a matter of trial strategy as to which [the courts] will not second guess counsel"). Because this Court's review is required to be deferential to counsel's thought processes at the time of trial, the Court cannot say that counsel's failure to object was unreasonable and fell below professional standards.

27

2.     *Counsel's alleged failure to introduce evidence of Zuniga's employment*

Zuniga contends that his counsel's failure to introduce evidence that he was working during the period of the alleged conspiracy hurt him before the jury. Balderas testified that she had two paycheck stubs from Zuniga's construction employer in Dallas, but forgot to bring them to trial, even though counsel requested that she do so. Zuniga did not attach those documents to his motion to vacate, even though he attached 121 pages of other exhibits. Zuniga claims that this evidence would likely have made a difference in the outcome of these proceedings.

Even if counsel had obtained the two pay check stubs and they were admitted into evidence, such information would not have been sufficient to counter the evidence from multiple other witnesses that from 2001 through 2007, Zuniga was involved in the transportation and distribution of cocaine. At best, the check stubs might have provided some explanation for his trips to Dallas, but that evidence would not have excluded the possibility that Zuniga both worked construction and distributed drugs. Moreover, the information Zuniga provided to the Probation Department regarding his employment after trial and before sentencing, contradicts his § 2255 claim as to the critical nature of the evidence. Zuniga reported that he "was employed with Robert Ortiz Construction in Dallas, Texas, in 2007. The defendant stated that he was employed for three months and earned $600.00 to $700.00 a week." D.E. 99 at ¶ 48. A three month job in Dallas does not begin to explain all of the trips to Dallas beginning in 2001 and ending in 2007. The evidence that Zuniga claims counsel failed to produce for the jury would not have changed the result of the trial.

Counsel's alleged failure did not prejudice Zuniga. <u>Carter</u>, 131 F.3d at 463 (failure to prove prejudice is fatal to claim of ineffective assistance).

3.    *Counsel's failure to subpoena Zuniga's telephone records*

Zuniga claims that counsel should have subpoenaed his telephone records and those records would have demonstrated that his telephone was not connected to the telephones of his coconspirators. Zuniga has not produced or described the evidence in sufficient detail for this Court to determine that it would have made any difference. In contrast, the evidence at trial from four different witnesses was that Zuniga used Boost phones, that he could obtain them under fake names and Zuniga changed phones regularly. Zuniga has alleged prejudice, but has not demonstrated that the evidence he claims would have benefitted him would have the desired effect. <u>See</u> <u>Armstead</u>, 37 F.3d at 206.

4.    *Counsel's failure to investigate Castillo, his criminal history, and the ownership of the red Ford Focus*

Zuniga claims that Castillo was the real registered owner of the red Ford Focus and that he had a lengthy criminal history in Minnesota. He claims that counsel should have investigated these allegations and used them to cross-examine Castillo which would have discredited Castillo before the jury. Although Zuniga claims that there are governmental records that support his allegations, he has brought this Court nothing but allegations. Conclusory allegations on critical issues in a § 2255 proceeding are insufficient to raise a constitutional issue. <u>United States v. Woods</u>, 870 F.2d 285, 288 n. 3 (5th Cir.1989); <u>see also</u> <u>United States v. Jones</u>, 614 F.2d 80 (5th Cir. 1980).

5.    *Counsel's failure to subpoena Jimenez*

Zuniga claims that Jimenez, had he testified at trial, would have implicated Compean as the owner of the cocaine found in Compean's car when he was arrested. Zuniga did not furnish the Court with an affidavit from Jimenez. Instead, he relies on the testimony of a border patrol agent that Jimenez told the agent that the drugs belonged to Compean when Jimenez was arrested. The agent's testimony does not establish that Jimenez was available and willing to testify at Zuniga's trial.

In general, "complaints of uncalled witnesses are not favored . . . ." in post-conviction proceedings. Harrison v. Quarterman, 496 F.3d 419, 428 (5th Cir. 1997). "[W]hen 'the only evidence of a missing witnesses' [sic] testimony is from the defendant, this Court views the claims of ineffective assistance with great caution.'" Id. (quoting Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001)). A defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony and willingness to testify is usually fatal to an ineffective assistance of counsel claim. Id.; see also Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir.1985).

In the Harrison case, the Fifth Circuit remanded for development of the record where defense counsel failed to interview a witness whose name and address, as well as the substance of his testimony was provided to defense counsel. There is insufficient evidence before this Court that Jimenez would have been available to testify or would have testified to what Zuniga claims. For that reason, this Court finds that Zuniga has not met his burden to show prejudice from counsel's failure to secure Jimenez' presence at trial.

**D.    Claimed Ineffective Assistance at Sentencing**

    1.    *Counsel's alleged failure to meet with Zuniga, provide him the PSR, and discuss the PSR with him*

During sentencing, counsel advised the Court that she met with Zuniga, discussed the PSR with him but did not provide him with a copy of the PSR, explained the advisory guidelines, and discussed how those guidelines applied to Zuniga. The Court recessed for an hour to allow Zuniga to read the PSR in its entirety. D.E. 142 at 4-5.[5]

When sentencing resumed an hour later, Zuniga testified that he had read the PSR and discussed it with his attorney. Id. at 7. Afterwards, Zuniga testified that he found two new factual objections to paragraphs 6 and 10 of the PSR. Id. at 8. Counsel also represented to the Court that Zuniga advised her that he was ready to proceed. Id. at 12.

---

    [5]    The Court advised Zuniga,

6 THE COURT: If you haven't read it word for word, or
7 you can't, your attorney will be there to read it. It's very
8 important to you and very important to me that I know that
9 you've read it, because the next question I'm going to ask you
10 is: Is it right or wrong? And you need to read it so you can
11 say, talk to your lawyer, and tell her, "That's right; that's
12 wrong; that's right; that's wrong." I want you to fully
13 understand it.
14 You have today before me a presentence investigation
15 that has an advisory guideline range calculation of 360 months
16 to life.
17 How old are you; thirty something?
18 THE DEFENDANT: Twenty-eight.
19 THE COURT: Twenty-eight. At thirty years you'd be
20 58 when you got out. We're going to be very careful about
21 doing this. The first part of being careful is for you to read
22 it; have it and read it. You understand that.
23 THE DEFENDANT: Yes, your Honor.
D.E. 142 at 4-5.

Zuniga initially had nothing to say to the Court at sentencing. Id. at 35. After the Court advised him it was his opportunity to speak to the Court and ask the Court to consider matters that Zuniga thought were important for sentencing, Zuniga responded that he did not believe that the trial was fair, that the government made a lot of mistakes and that the prosecutor called him the devil during closing argument. Id. at 36-37.[6] The Court sentenced Zuniga to 336 month, a mid-Guideline sentence, with lifetime supervised release, fined Zuniga $10,000 and imposed a $100 special assessment. Id. at 37-38. Based upon this record, even if Zuniga's allegations are true, which the record does not support, he has not shown prejudice from counsel's alleged failure to meet with him before sentencing, to provide him with a copy of the PSR, or to discuss the PSR with him before sentencing.

2.      *Alleged failure to develop mitigating evidence*

---

[6]   Zuniga's assertion that the government's closing argument was improper was not raised on appeal and is not raised as an issue in Zuniga's § 2255 motion to vacate. After the comment by the government attorney, the Court instructed the jury,

> 1 . . . The first
> 2 are comments that I want to make to refocus your attention not
> 3 on passion but on the evidence of the case. The argument of
> 4 Defense that the Government's Counsel made reference to the
> 5 location where these witnesses would be found and the character
> 6 of the Defendant where he might also be found. That is to say
> 7 that if you're trying the devil, you go to hell to find your
> 8 witnesses. That is argument and that is not to be considered
> 9 by you as a characterization of the Defendant. All Defendants
> 10 are presumed innocent and it is up to the Government to prove
> 11 the Defendant guilty on the basis of the evidence and the
> 12 Defendant -- the Government's reference to the poor character
> 13 of the witnesses was authorized by the Defendant's attack on
> 14 the poor character of the witnesses and you are to consider
> 15 comments as being in response to the Defendant's attack on her
> 16 on witnesses. Just leave it at that.

D.E. 140 at 58.

Counsel allegedly failed to interview her client to ask about mitigating factors. Yet, during sentencing, counsel represented to the Court that she discussed the PSR with Zuniga before sentencing and Zuniga agreed that she had, although she did not provide it to him. Zuniga's allegations do not coincide with the record before this Court.

Zuniga states that his father died when he was young, that he was a responsible young person who helped his mother and worked to help support his family, and that he continues to help his mother. He also has a young child. D.E. 155 at 14-17. According to the PSR, Probation could not verify this information because Zuniga gave them a telephone number that was not in service. D.E.99 at ¶¶ 42, 43. During trial, this Court heard testimony that Zuniga's mother lived with him, that he was married and had an infant child.

In support of his motion to vacate, Zuniga's sister provided an affidavit. D.E. 157-1, Exhibit F. Her Affidavit recites that Zuniga began working at the age of 17 to help support their family and that he continued to help support his mother as an adult, even after he married and had a baby. Her Affidavit states that Zuniga worked construction with their uncles. Id. at pp. 119-120. She states that counsel did not contact her after sentencing to obtain information for sentencing. Id. at 120.

Zuniga's information to the Probation Department regarding his employment did not include construction work with relatives, in fact there were large gaps in his reported employment history.  D.E. 99 at ¶¶ 48-50. When Zuniga had the opportunity to tell the Court about factors that he thought this Court should consider, he did not refer to anything in his background, only to the conduct of the trial.

The Court does not decide whether counsel failed to do what Zuniga alleges, but finds that Zuniga was not prejudiced. Zuniga's sentence was based upon his leadership role in a multi-year drug conspiracy that moved more than 50 kilograms of cocaine. Even if counsel had done the things that Zuniga claims she should have, Zuniga would have received the same sentence. Zuniga has not shown prejudice from counsel's alleged failures.

3. *Alleged failure to challenge drug quantity calculation*

Zuniga claims that counsel was ineffective because she failed to challenge the calculation of drug quantity for relevant conduct. Zuniga is mistaken. Counsel filed both written objections and urged the objections at sentencing on both issues.

Counsel did not object to the 25.93 kilograms of cocaine that the government seized from four men who testified that they were transporting cocaine for Zuniga. She objected to the additional 79.93 kilograms of cocaine that the Probation department included as relevant conduct in the PSR. D.E. 142 at 15. After reviewing the evidence at trial and hearing argument by defense counsel and the government, the Court stated,

> 16 I am going to sentence at level 36 because I think
> 17 whatever amount of kilos was transported was way beyond 50. I
> 18 don't have to know how many more it was beyond 50. I'm not
> 19 going to find any more than that, because then the range of
> 20 pounds or kilos becomes quite large, and I would be engaging in
> 21 speculation. But it is very reasonable to sentence at level
> 22 36, which is what I intend to do.

Id. at 23. The Court considered the length of the conspiracy, testimony that some of the coconspirators began transporting drugs in 2001 and others continued until 2007 when Zuniga and others were arrested. The Court considered the numbers of trips that each co-

34

conspirator testified to making, 2-3 round trips per week over the period between 2001 and 2007.

Counsel's decision not to challenge the quantity of drugs seized  was likely a strategic one in an effort to minimize Zuniga's punishment without completely destroying her own credibility before the Court. Although the jury did not find drug quantity, they obviously believed the testimony of at least some of the coconspirators. Moreover, each co-conspirator testified in such a way that it was clear that each transported far more cocaine than was seized. In considering counsel's conduct, this Court must regard it deferentially. In that light, Zuniga has not produced evidence that counsel's conduct fell below reasonable professional standards.

## E.    Claimed Ineffectiveness of Counsel on Appeal–Failure to Argue Drug Quantity

Zuniga was appointed counsel on appeal who urged two issues on appeal, 1) the evidence was insufficient to support his conviction and 2) the testimony of several coconspirators that Zuniga threatened them or that they feared Zuniga should have been excluded as unfairly prejudicial. D.E. 148. The Fifth Circuit affirmed.

For Zuniga to show prejudice from counsel's failure to argue that his sentence was too long because the relevant conduct was incorrectly calculated, he must show that the Fifth Circuit likely would have reversed his sentence. The Fifth Circuit has said, "The district court's calculation of the quantity of drugs involved in an offense is a factual determination . . . entitled to considerable deference and will be reversed only if [it is] clearly erroneous." United States v. Betancourt, 422 F.3d 240, 246 (5th Cir. 2005) (internal quotations and

citations omitted). In making a factual finding regarding the quantity of drugs attributable to a defendant, "the district judge may consider any information that has sufficient indicia of reliability to support its probable accuracy," and the district court must make such factual findings "by a preponderance of the relevant and sufficiently reliable evidence." Id. at 247; see also United States v. Medina, 161 F.3d 867, (5th Cir. 1998) (amount of drugs attributable to conspiracy defendant need not be amount actually seized, but district judge can estimate the quantity involved); United States v. Brito, 136 F.3d 397, 416-17 (5th Cir. 1997) (affirming sentence where district court estimated drug quantity based upon trial testimony concerning the number of trips he made and the quantity transported each time).

Here, the Court had the sworn trial testimony of four coconspirators whose testimony regarding the conspiracy was believed, at least in part, by the jury. Based upon each of their testimony it was not unreasonable for the Court to draw an inference that in addition to the 25.93 kilograms of cocaine seized in the four seizures of drugs, another similar quantity of drugs had been transported as part of the conspiracy during the period of the conspiracy's existence. Under these circumstances, the likelihood of successful challenge to relevant conduct drug quantity on appeal was next to nothing.

Appellate counsel is not constitutionally required to include every potentially meritorious argument on appeal, and is certainly not constitutionally required to make a frivolous argument. Phillips, 210 F.3d at 348; United States v. Williamson, 183 F.3d 458, 462 (5th Cir. 1999). Because controlling Fifth Circuit authority explicitly approves the Court's method of calculation of the drug quantity and the evidence used is the same type of

evidence approved, counsel's failure to argue on appeal that Zuniga's relevant conduct drug quantity was overstated did not fall below applicable professional standards.

## V.   CERTIFICATE OF APPEALABILILTY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Zuniga has not yet filed a notice of appeal, the § 2255 Rules instruct this Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, § 2255 Rules.

A COA "may issue. . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

As to claims that the district court rejects solely on procedural grounds, the movant must show that "jurists of reason would find it debatable whether the petition states a valid

37

claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Slack</u>, 529 U.S. at 484.

The Court concludes that reasonable jurists could not debate the denial of DeLeon's § 2255 motion on substantive grounds nor find that the issues presented are adequate to deserve encouragement to proceed. <u>Miller-El</u>, 537 U.S. at 327 (citing <u>Slack</u>, 529 U.S. at 484). Similarly, as to the claims that this Court has addressed on procedural grounds, the Court finds that Zuniga cannot establish at least one of the <u>Slack</u> criteria. Specifically, jurists of reasons would not find this Court's procedural rulings debatable. Accordingly, Zuniga is not entitled to a COA as to his claims.

## VI.  CONCLUSION

For the foregoing reasons, Zuniga's § 2255 motions (D.E. 155, 157, 158) are DENIED and he is DENIED a Certificate of Appealability.

It is so ORDERED on the 24th day of February 2012.

HAYDEN HEAD
SENIOR U.S. DISTRICT JUDGE